BORINQUEN HOME CORPORATION, Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellee.

No. 12463.   Decided December 13, 1961.

*B. Sánchez Castaño* and *R. Rivero Cervera* for appellant.   *J. B. Fernández Badillo, Secretary of Justice, Arturo Estrella* and *Stanley R. Segal, Assistant Secretaries of Justice,* for apellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

PER CURIAM.

By public deed No. 2800 executed on June 28, 1949 before Notary Raúl Trujillo Santiago, appellant Borinquen Home Corporation sold to Caparra Commercial Corporation five lots in the commercial district of Caparra Heights urbanization for the total price of $100,000, of which sum $70,000 was attributed to the value of a structure used for commercial purposes which is erected on one of the said lots.[1]   The payment of the full selling price was deferred for a period of five years, extendible to five more years at the purchaser's option, and secured by the constitution of a first mortgage on the real properties sold.[2]   It was further agreed that the mortgagor "shall be bound to credit to the principal...the total amount of the selling price of any of the mortgaged lots or any portion thereof sold by the said debtor, the mortgagee binding itself to cancel partially the first mortgage and

---

[1] The total selling price was apportioned among the different real properties as follows:

Lot 1— $1,452.95
Lot 2— $1,452.95
Lot 3— $1,452.80
Lot 4—$22,907.50
Lot 5— $2,731.80

Adding the value of $70,000 of the structure erected on lot 4, the total price is $100,000.

[2] In the mortgage contract there was included an agreement as to interest at 4 per centum annually payable in monthly instalments as they became due, and the mortgagor assumed the customary obligations to pay taxes, insurance, and other usual taxes, the nonperformance of which would bring about the advanced maturity of the mortgage.

also to liberate the mortgage lien ... constituted on the lot or lots after the price thereof is credited to the mortgage and actually delivered to the mortgagee."

On July 13, 1949 the debtor corporation sold lots Nos. 1, 2, and 3 for the sum of $4,360.70, and in compliance with the obligations which it assumed under the above-transcribed clause it credited the same to the principal of the mortgage credit, which was thereby reduced to $95,639.30. The corresponding public document of partial cancellation of mortgage was executed by deed No. 1520 of the same date before Notary Mariano Canales Delgado. Two months later, on September 13, lot No. 5 was sold for the sum of $10,000, which price was credited to the outstanding principal—deed No. 2869 executed before Notary Raúl Trujillo Santiago—which was reduced to $85,639.30, payment of which was secured only by the mortgage which encumbered lot 4 and the structure thereon. In January 1950, the amount of $639.30 was credited in cash. The balance of $85,000 was paid off in 1953.

The taxpayer reported in its income-tax return for 1949–50 the proportional part of the benefit included in the sum of $15,000 which was received in that year. We state in passing that there is no dispute between the parties on the manner of determining the total profit received by Borinquen Home Corporation from the sale transaction.[3]

---

[3] The gain was determined as follows:

|  |  |  |
|---|---|---|
| Selling Price of the Lots |  | $30,000 |
| Selling Price of the Structure |  | $70,000 |
| Total |  | $100,000 |
| Costs of Lots | $2,831.97 |  |
| Cost of Structure | $69,171.51 |  |
| Total |  | $72,003.48 |
| Gain from Sale |  | $27,996.52 |

The main controversy is confined to determining whether the action of the Secretary of the Treasury in including in the year 1949–50 the total amount of the profit realized by the taxpayer from the aforesaid transaction is correct, even though the final amount of the selling price was received three years later. The trial court held that it was.

Section 5(c) of the Income Tax Act of 1924 (Act No. 74 of 1952, Sess. Laws, p. 400, 13 L.P.R.A. § 663(c)), provides that for the purposes of determining the amount of gain or loss "the amount realized from the sale or other disposition of property shall be the sum of any moneys received plus the fair market value of the property (other than money) received." Section 5(e) refers to the exception recognized when the property is sold under contract "providing for payment in instalments," in which case the tax is imposed on that portion of the price paid representing gain in the year in which such payment is received.[4] Sections 82, 83, and 84 of Regulations No. 1, approved May 17, 1926, were promulgated in order to implement the provisions on deferred-payment sales and instalment sales. Those sections read as follows:

"Article 82.—*Sale of Real Estate Involving Deferred Payments.*—Deferred payment sales of real estate ordinarily fall into two classes when considered with respect to the terms of sale, as follows:

"(1) Installment transactions, in which the initial payment is relatively small (generally less than one-fourth of the purchase price) and the deferred payments usually small and of small amount. They include (*a*) sales where there is immediate transfer of title when a small initial payment is made, the seller being protected by a mortgage or other lien as to deferred pay-

---

[4] Regarding the situation of deferred-payment sales of real property after 1954, see § 44(b) of Act No. 91 of June 29, 1954 (Sess. Laws, p. 474, 13 L.P.R.A. § 3044, Supp.), and §§ 44-2, 44-3, 44-4, and 44-5 of the Regulations (13 R.& R.P.R. § 3044-2). On the history on these provisions on instalment sales, see 1 Paul & Mertens, Law of Federal Income Taxation § 12.01 *et seq.*

ments, and (b) agreements of purchase and sale which contemplate that a conveyance is not to be made at the outset, but only after all or a substantial portion of the agreed installments have been paid.

"(2) Deferred payment sales not on the installment plan, in which there is a substantial initial payment (ordinarily not less than one-fourth of the purchase price), deferred payments being secured by a mortgage or other lien. Such sales are distinguished from sales on the installment plan by the substantial character of the initial payment and also usually by a relatively small number of deferred payments.

"In determining how these classes shall be treated in levying the income tax, the question in each case is whether the income to be reported for taxation shall be based only on amounts actually received in a taxing year, or on the entire consideration made up in part of agreements to pay in the future.

"Article 83.—*Sale of Real Estate on Installment Plan.*—In the two kinds of transactions included in class (1) in the foregoing article, installment obligations assumed by the buyer are not ordinarily to be regarded as having a fair market value, and the vendor may report as his income from such transactions in any year that proportion of each payment actually received in that year which the gross profit to be realized when the property is paid for bears to the gross contract price. If the return is made on this basis and the vendor repossesses the property after default by the buyer, retaining the previous payments, the entire amount of such payments less the profit previously returned, will be income to the vendor and will be so returned for the year in which the property was repossessed, and the property repossessed must be included in the inventory at its original cost to himself (less any depreciation as defined in articles 128 and 129). If the taxpayer chooses as a matter of settled practice consistently followed to treat the obligations of the purchaser as having a fair market value and to report the profit derived from the entire consideration, cash and deferred payments, as income for the year when the sale is made, this is permissible. If so treated, the rule prescribed in article 84 will apply.

"Article 84.—*Deferred-Payment Sales of Real Estate Not on Installment Plan.*—In class (2) in article 82 the obligations

assumed by the buyer are much better secured because of the margin afforded by the substantial first payment, and experience shows that the greater number of such sales are eventually carried out according to their terms. If these obligations have a fair market value, they are to be considered as the equivalent of cash and the property realized from the transaction is taxable income for the year in which the initial payment was made and the obligation assumed. If the buyer defaults and the seller regains title to the land by agreement or process of law, retaining payments previously made, he may deduct from his gross income as a loss in the year of repossession any excess of the amount previously reported as income over the amount actually received, and must include such real estate in his inventory at its original cost to himself (less any depreciation as defined in articles 128 and 129). If the obligations have no fair market value, the amount of the initial payment shall be applied against and reduce the basis, as provided in section 7 and articles 32–44 of the property sold and if in excess of such basis, shall be taxable to the extent of the excess. Gain or loss is realized when the obligations are disposed of or satisfied, the amount being the difference between the basis as provided above and the amount realized therefor. See articles 32 and 125."

In *Rubert* v. *Tax Court*, 74 P.R.R. 48 (1952), we said that these regulatory provisions are not mandatory but merely directory, and that they were not so strict as to require the Secretary to accept as sale on the instalment plan every transaction in which the initial cash payment was less than one fourth of the total price agreed upon. We also said that since the measure in question permits the apportionment of the gain over several years, it should be strictly construed against the taxpayer.

As may be seen, the transcribed sections cover two different situations: (1) instalment sales properly speaking, in which case the obligations on the instalment plan contracted by the purchaser are ordinarily deemed not to have a fair market value; and (2) deferred-payment sales, but not in instalments, in which case the obligations are deemed to be

part of the price if they have a market value. In the first instance, there should not only be a small initial payment, but also deferred payments *"usually small and in reduced amounts."* In the second instance, the initial payment must be substantial—usually not less than one fourth of the selling price—and is distinguishable from the former in the relatively small number of deferred payments.

■ In the instant case the sums received during the taxable year in which the sale was executed amount to only 15 percent of the selling price, or less than one fourth, but later only one deferred payment could be made upon selling the mortgaged real property reserved by the purchaser. This is a typical example of a deferred-payment sale, but not an instalment sale.[5] See *Six Hundred and Fifty West End Ave. Co.*, 2 B.T.A. 958 (1925); *B.B. Todd, Inc.*, 1 B.T.A. 762 (1925).

■ On the other hand, the notice to the taxpayer to pay the tax on the total gain realized from the sale implicitly entailed the administrative determination that the obligations assumed by the purchasing corporation had a fair market value. *Spence* v. *Secretary of the Treasury*, 78 P.R.R. 389, 393 (1955). The evidence introduced is not only devoid of the slightest intimation that the mortgage obligation assumed by the purchaser did not have a market value on the date it was contracted, but also that it possibly was otherwise, since reference is made to the fact that "in the year 1943 [*sic*] it sold the mortgage for $85,000, and

---

[5] A similar solution must be reached if we consider isolatedly the transaction involving lot No. 4 which was, in our opinion, the correct manner of approaching the transaction, since as respects the other lots on which there was no structure the total gain was received during the same taxable year of the sale. It is to be noted that although the transfers were made in the same deed, it actually comprised five separate sales.

As to lot No. 4 and the structure, the selling price was $92,907.50, of which $7,907.50 were received in the taxable year 1949–1950. The balance of $85,000 was received in full in 1953.

that it declared and paid its income tax." (Tr. Ev. 4.) Under these circumstances, the trial court did not err in holding that the Secretary's action in including the total gain from the transaction in the year 1949–1950 was correct. *Cf. Rubert* v. *Tax Court,* 74 P.R.R. 48 (1952) ; *Carmen Centrale, Inc.* v. *Sec. of Treas. of P. R.,* 75 P.R.R. 320, 329–30 (1953) ; *Spence* v. *Secretary of the Treasury,* 78 P.R.R. 389, 393 (1955).

■ Regarding the other assignment of error to the effect that the trial court in the incident on approval of the computations refused to consider the amount paid in 1953 by the taxpayer as income tax on the gain realized in that year from the final payment of $85,000, it will suffice to say that § 57(h) of the Income Tax Act of 1924, as amended by Act No. 9 of October 8, 1954 (13 L.P.R.A. § 775) barred any action favorable to the plaintiff. *Petrovich* v. *Sec. of the Treasury,* 79 P.R.R. 237 (1956). In this case there did not even concur the circumstances of *Piñán* v. *Sec. of the Treasury,* 83 P.R.R. 303 (1961), where, despite the fact that the taxpayer could not claim the corresponding refund because the four-year period prescribed by law had expired, we ratified the holding in *Petrovich.* As matter of fact, by March 28, 1953, date on which notice was given by the Secretary to the appellant on his determination of the tax on the total gains realized in 1950, it could claim the refund of the amount paid in 1953 because the four-year period for the payment of the tax had not yet expired.

The judgment rendered by the Superior Court, San Juan Part, on November 30, 1954, will be affirmed.